The PITTSBURG AND MIDWAY COAL COMPANY, Appellant,

v.

William BARNARD, Appellee.

Court of Appeals of Kentucky.

Dec. 5, 1969.

---

J. Quentin Wesley, Wathen & Wesley, Morganfield, for appellant.

George B. Simpson, Sturgis, Michael J. Leatherman, Lexington, Thomas R. Emerson, Frankfort, for appellee.

DAVIS, Commissioner.

This is a workmen's compensation proceeding. The injured employee, Barnard, sought compensation for total permanent disability. The Board rejected the claim

for total permanent disability and limited recovery to total temporary disability. Barnard appealed to the circuit court where the Board's order was upset and the case remanded to the Board "for redetermination of the degree of disability of claimant and for giving an award in keeping with the evidence and current law." In an opinion preceding the circuit court's order from which the above quotation is taken, the trial court expressed the view that the evidence before the Board reflected that Barnard could work in nearly any other occupation except underground coal mining and noted that there should be a determination of what other employment opportunities are available to Barnard in the labor market. In the opinion the trial judge recited: "This case is ordered remanded to the Board for further findings, pursuant to the holding in Osborne v. Johnson, Ky., 432 S.W.2d 800."

The employer prosecutes this appeal asserting that (1) Osborne v. Johnson, Ky., 432 S.W.2d 800, is inapplicable, and (2) the claimant's proof was not so strong as to compel a finding in his favor.

The appellee concedes that the rule of Osborne v. Johnson does not apply to these proceedings because the present claim was initiated on August 15, 1967, and the effective date of Osborne v. Johnson was November 1, 1968. This circumstance, however, is not dispositive of the appeal.

On Wednesday, February 1, 1967, Barnard sustained a cut to the index finger on his right hand. Apparently, the injury was slight and has completely healed without ill effect. On the day of the injury, Barnard was sent to a doctor by his employer for precautionary treatment. The doctor administered to him a tetanus toxoid injection. Barnard performed his normal work duties on Thursday and Friday, but on Saturday he began to notice a blurring of his vision. He described the incident: "I thought at first it was my glasses dirty, and I cleaned my glasses off and still it didn't help; I still had that blurredness in

my eyes, but it left and I went on home that night from work, and Sunday morning I woke up to get up and both eyes were swollen completely to." Barnard said that he had never experienced a similar disability.

Barnard consulted Dr. Elliott on Monday, February 6. Dr. Elliott testified that Barnard was suffering inflammation of both eyes "which appeared to be an allergic conjunctivitis or some sort of allergic reaction * * *. At this point, on February 6th I assumed, but could not be certain, that the allergic conjunctivitis was a result of an allergic reaction to the tetanus toxoid injection."

A summary of Dr. Elliott's view of the case is fairly expressed by the following question and answer appearing in his deposition:

"Q. But this patient is really not allergic to toxoid, he is allergic to something in the mines that you say is possibly set off by his reaction to the toxoid, is that correct?

A. I am not entirely sure. The thing that a physician is primarily concerned with is either curing a patient and preventing the disease again; and in preventing it again, I would advise him not to take tetanus toxoid and not to work in the mine. Of course, I realize that your concern is arriving at a cause here and this sort of thing, and this is where it is hard for me to help you except to say that he did have a reaction immediately after he did have his tetanus toxoid; he also reacts when he goes underground in the mine; and arriving at cause and effect here is very difficult. And the answer is further complicated with the fact that we have two different opinions as to cause from two different opthalmologists."

Dr. Elliott treated Barnard with several steroid and antibiotic ointments, seeing him four more times in February before referring him to Dr. Hermayer, an opthalmolo-

gist. The doctor explained that he referred Barnard to the specialist because he observed no improvement in Barnard's condition after the usual course of treatment.

A portion of the testimony of Dr. Hermayer points up some pertinent facts:

"A. On March 1, 1967, I first saw Mr. Barnard at the request of Dr. Barney Elliott, who recommended Mr. Barnard to me, because of a rather long-standing irritation of the patient's eyes, which did not respond to his treatment, using eye drops and eye ointment; when I first saw Mr. Barnard his vision in each eye was almost 20/20; he had a rather severe inflammation of both eyes, which wasn't a particular characteristic of any specific disease, and I noted on my records that I suspected that it might be caused by a virus; he was put on rather intensive therapy with eye drops and advised to return in one week, if he wasn't improved. He came back on March 8, 1967 and stated he was quite a bit improved, but still showed some inflammation of the eyes. He was advised to return again in one week, but not to work; this has been the same situation on March 15th, at which time I advised Mr. Barnard to try to work if he felt equal to it, or to come and see me in ten days if he was not improved. I didn't see him again until April 10, 1967; at this time he told me that he had been quite a bit improved until about six days prior, which would be about April 4th, when he had a recurrence of his inflammation; however, he still had not worked in the mines; he was again put on treatment for the eyes and when seen on April 14 and April 19, there was some evidence of improvement; however, on April 22, he came in looking worse; subsequent examinations on April 25 and April 29, May 3, May 8, May 15, May 22, May 27, June 5, showed an erratic course; sometimes he would be better and sometimes he would be worse; * * *."

Dr. Hermayer referred Barnard to the University of Louisville Medical School for further examination, but no evidence appears of record reflecting the result of that examination. Dr. Hermayer's testimony reflects the doctor's belief that Barnard is allergic to some substance encountered in underground coal mines. The doctor did not believe that the tetanus injection triggered the allergic reaction. When specifically asked whether he could state the cause of Barnard's allergy or even whether he suffered from an allergy, Dr. Hermayer responded:

"A. I cannot be certain; to establish it as a certainty would be to find the specific agent that he is sensitive to and see if he reacts to it, other than being in the coal mines; For instance, say he is allergic to one of the elements in the coal mines; he wouldn't come into contact with it except if he were down in the mines and perhaps only in minor traces; but if he is very sensitive to it, even though it's tolerable by most people, he cannot tolerate it; but to prove that you would have to find this agent, and then expose him to it outside the coal mines and see if he could develop this kind of reaction. So that when you say can you state with any certainty, I must say that until you can identify the agent, this is pretty much in the neighborhood of speculation."

Dr. Hermayer advised Barnard that he should no longer work in underground coal mining. Barnard related that he had undertaken to resume coal-mining duties on three separate occasions but was forced to quit each time because of the return of the eye inflammation.

The following questions and answers appeared in the cross-examination of Dr. Hermayer:

"Q. You can't say with any reasonable medical certainty what actually is causing Mr. Barnard's trouble, is that right?

A. No, sir, that is correct.

Q. You cannot say that the shot he received causes his present problem?

A. Correct. If I may add, I have serious doubts that the shot had anything to do with it."

\* \* \* \* \* \*

"Q. It's possible that he could be allergic to something his wife puts in his lunch box, as far as you know, right?

A. I suppose you could say that, yes.

Q. He could be allergic to some of the clothes he wears in the mines, is that correct?

A. Uh-huh.

Q. You just don't know what it is, do you?

A. Correct.

Q. Until you do establish, with a reasonable medical certainty what is causing his allergy, you can't really pinpoint it to actual working conditions in the mines, is that correct?

A. That's correct."

On Barnard's motion the Board joined the Special Fund as a party and appointed Dr. John W. Pate to examine Barnard. KRS 342.121. Dr. Pate's report, following an examination had on November 4, 1968, after reciting the clinical findings made, concluded with the words: "The patient had no complaints and no visual disability, therefore, it appeared the patient has completely cleared as a result of this mishap." The Board sustained Barnard's exceptions to Dr. Pate's report, saying the report was not responsive to all of the questions propounded. But the Board considered the report along with the other evidence before it and concluded that Barnard had failed to sustain his burden of persuading the Board of any work-connected permanent disability.

It is apparent from the medical testimony presented in behalf of Barnard that he failed to establish the source of the allergic reaction which he suffered. The medical evidence presented in his behalf certainly was not so conclusive as to compel the Board to find that Barnard's allergic condition was work-connected. Cf. Wiard v. Ken-Wel, Inc., Ky., 419 S.W.2d 765, and the cases discussed and cited there. It follows that the circuit court erred in upsetting the Board's findings.

The judgment is reversed with directions to enter a new judgment affirming the order of the Board.

All concur.